

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00048-CV

———————————————

IN THE INTEREST OF M. H., A CHILD

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-681641-20

---

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant Mother appeals the trial court's order terminating the parent–child relationship between Mother and her minor daughter, Maxie.[1] In her sole issue, Mother challenges the legal and factual sufficiency of the trial court's best-interest finding. Because the evidence supports the trial court's finding that terminating the relationship was in Maxie's best interest—under the applicable legal- and factual-sufficiency standards—we affirm.

### Brief Background

When Maxie was born, Mother did not know who Maxie's father was. Both Mother's and Maxie's drug screens were positive for marijuana. When confronted about these test results, Mother admitted using marijuana in her pregnancy's eighth month because she had experienced nausea and vomiting. Four days after Maxie's birth, after meconium and umbilical-cord test results came back positive for cocaine, the Texas Department of Family and Protective Services (the Department) filed a termination suit, and Maxie was removed from Mother's care. After a bench trial, the trial court ordered that the parent–child relationship between Mother and Maxie be terminated.[2]

---

[1]We use an alias to refer to the child and other persons by which she could be identified. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]For reasons not clear from the record, the trial court abruptly recessed the proceeding on October 27, 2021, and resumed hearing this cause on January 18, 2022.

## Standards of Review

For a trial court to terminate a parent–child relationship, the party seeking termination (here, the Department) must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

### Legal Sufficiency

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the

sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

**Factual Sufficiency**

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## Best-Interest Finding

Mother challenges only the second termination ground: whether terminating the parent–child relationship was in Maxie's best interest.

**Applicable Law**

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to

4

support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of one of the grounds for termination listed in Subsection (b)(1). *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A)　　the [child's] desires . . . ;
>
> (B)　　the [child's] emotional and physical needs[,] . . . now and in the future;
>
> (C)　　the emotional and physical danger to the child now and in the future;
>
> (D)　　the parental abilities of the individuals seeking custody;
>
> (E)　　the programs available to assist these individuals to promote the [child's] best interest . . . ;
>
> (F)　　the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;
>
> (G)　　the stability of the home or proposed placement;
>
> (H)　　the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and
>
> (I)　　any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply

to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**Evidence**

Because Mother challenges only the sufficiency of the evidence to support the best-interest finding, we set forth the trial evidence as it relates topically to the pertinent *Holley* factors.

Mother's acts and omissions, particularly her continued drug use, indicated that her parent–child relationship with Maxie was not a proper one:

- Drug tests conducted at Maxie's birth indicated that Mother and Maxie were both positive for marijuana and cocaine. During the suit, Mother continued to test positive for marijuana and cocaine. She skipped her drug tests in August and December 2020, rendering the test results presumed positives (according to the trial court's orders). She did not take another drug test after testing positive for cocaine in June 2021.

- Mother admitted using marijuana while pregnant with Maxie but denied using cocaine.

- Mother "stated she did not see anything wrong with smoking marijuana while pregnant."

- When Maxie first went into foster care, she was having "little twitches" and "shivers." Maxie's foster mother took her to the emergency room, where the neurosurgeon concluded that the twitches "were most likely due to withdrawals from the drugs that she'd been on."

- In 2021, about four months before the termination trial commenced, Mother gave birth to another child, Minnie. Right before the birth, Mother tested positive for cocaine. Minnie's meconium tested positive for marijuana.

6

In addition to her continued drug use, Mother's post-removal relationship indicated that she lacked sufficient parental abilities and the ability to maintain a stable home:

- While Mother was pregnant with Minnie, Fort Worth Police responded to a domestic disturbance call at Mother's apartment.

- Mother told the responding officer that her boyfriend and Minnie's father, Bobby, had assaulted her in the past, including punching her in the stomach, causing her to miscarry, and dragging her out of the house while trying to take her phone away, causing her to scrape her legs. The officer observed scrapes on Mother's legs and pictures that Mother showed him to support her allegations.

- A grand jury charged Bobby with continuous violence against the family. The indictment alleged two separate acts of assault on Mother and a third on another woman. The other woman Bobby was charged with assaulting was "his first baby's mother."

- The trial court ordered that Mother could have visitation with Maxie only if Mother's "boyfriend" was not present. Mother violated that order. Mother and Bobby appeared at a permanency conference via Zoom alone together in a car, also in violation of the court's safety plan.

- The trial court ordered Mother to participate in and actively engage in domestic-violence classes through SafeHaven. But Mother did not complete the classes.

Other record evidence supported a conclusion that Mother lacked parental abilities and the ability to maintain a stable home:

- Mother was "unsure" who Maxie's father was and could not give CPS a name. During the suit, Mother identified two men as possible fathers of Maxie and told the Department that both men did not want to be legally named as the father. Another man came forward as a potential father, but he was ruled out by a paternity test. At the time of trial, no one else had come forward claiming to be Maxie's father.

- Mother "did not appear to be concerned about finding a placement option for her child," even when faced with removal.

- CPS tried to find a family member with whom Maxie could be placed, but all the relatives Mother identified were disqualified due to their CPS history.

Maxie's foster parents kept in contact with Mother throughout this case. They allowed Mother to come to their home and visit Maxie on Thanksgiving and Christmas and to pick her up for visits on Easter and her birthday. They also visited Mother's apartment multiple times. Based on their observations, foster mother testified about Mother's living conditions:

- Mother's electricity went out more than once. At Christmastime, when Mother was pregnant, she said that "it had been off for a couple of weeks" and that she would just wear a jacket to keep warm.

- On one occasion, all the food in the refrigerator was spoiled.

- Mother's cat had given birth to a kitten the same day Mother gave birth to Minnie. The couch was torn up with the springs exposed, and Maxie's foster parents could see "the cat with its feces and baby kitten still at the bottom of the couch."

- Maxie's foster parents did not want to set Maxie down on the floor because she would pick up things, and there were things on the floor that she would try to put in her mouth. The foster mother observed something "brown" on the floor at Mother's apartment but did not know if it was food or feces.

- When Mother was seeking a new apartment, she told Maxie's foster mother that she was "taking care of" her brothers since her mother (Grandmother)[3] had been sick.

The foster parents further testified about the help Mother sought and received

---

[3]Grandmother is not Mother's biological mother but effectively played that role in her life from the time Mother was two years old.

from them:

- In addition to providing her with household items and paying for her electricity at Christmas, Maxie's foster parents gave Mother cash and paid for food, clothes, transportation, and application fees for apartments when Mother said she needed help.

- A couple of weeks after Minnie was born, Mother asked Maxie's foster mother to purchase her a plane ticket so she could go on a family vacation to Miami. The foster mother declined this request.

- When Bobby was in jail on the continuous-family-violence charge, Mother asked Maxie's foster mother for money to bail him out of jail. The foster mother declined this request as well.

Maxie's foster mother testified about the foster parents' and Mother's relationship with Maxie:

- Mother was inconsistent in her visitation with Maxie. After Minnie was born, Mother would cancel or miss visits because Mother was "tired." Even after the foster parents changed the timing of the visits to accommodate Mother, she would still miss the visits. After the July 2021 visit, Mother had no visits with Maxie until January 2022. The January visit was rescheduled from a Christmas visit that Mother did not make.

- At first, the foster parents "never intended to adopt" Maxie—they supported the State's putting her back with Mother—but that changed "[w]ith the thought of her going back to an environment that's not safe." At the time of trial, they were considering adopting Maxie.

Mother testified about, among other things, her parental abilities, the programs available to assist her to promote Maxie's best interest, her plans for Maxie, and the stability of her home:

- She had just moved in with her father (Grandfather) in January. She had to move out of her apartment because of "damages" that she could not afford to fix.

9

- Her father had recently been arrested and jailed on an assault charge based on an "altercation" they had when Mother was 17.

- Her father's house was a safe place and had security cameras.

- Her father had "changed" since he got out of jail. He no longer smoked or drank; he just went to work and came home. When he was not incarcerated, he supported her if she needed help.

- Her father had given her one of his cars so that she did not have to ask for help with transportation anymore; he did not like her asking for help to then have others use it against her.

- She had not yet made an appointment to get her driver's license, nor did she know what to do to get one.

- She had found resources to help with her children. She received food stamps and WIC. Bobby and his family helped her out "a lot."

- She was employed at Overture Home Care and made $13 per hour.

- Bobby was violent toward her when she was pregnant with Minnie. Nevertheless, she tried to get the charges against him dropped. She was no longer in a relationship with him or anyone else. Bobby does not know where her father lives.

- Grandmother and Mother sometimes "g[o]t into it," but they were doing well at the time of trial.

Mother also offered the following excuses for her acts and omissions:

- She does not like asking people for help, but Maxie's foster parents told her not to be "scared to ask."

- She chose not to visit with Maxie after July 2021 because she could not have visitation at her apartment, and she did not like to "just sit there" with Maxie in "that little small room" at Our Community Our Kids (OCOK).[4] She felt

---

[4]OCOK is a private provider of community-based care that contracts with the Department to provide "foster care case management, kinship, and family reunification services" in parts of the state, including Tarrant County. *See* Tex. Dep't of Family & Protective Servs., https://content.govdelivery.com/accounts/TXDFPS/bulletins/

10

like they bonded more at her apartment.

- She would ask Maxie's foster parents for help because she trusted them, but that trust stopped after their court appearance in October 2021. She did not know that her communications with Maxie's foster parents would be used against her in court, and she did not want to talk to them after that. She stopped visiting Maxie because she was upset with Maxie's foster parents. She had planned to spend Christmas with Maxie at Maxie's foster parents' house like she did the previous year but did not feel comfortable going over there anymore. She put her pride aside for the January 2022 visit with Maxie.

- Mother reached out to SafeHaven "a lot of times" but never took the requisite domestic-violence classes because they never sent her the Zoom link. She understood that she was required to do those classes as a part of her service plan but felt that she did not "need it."

- She last used marijuana in March of 2021. She was "scared" to take any more drug tests because they came back positive for cocaine when she was not doing cocaine.

Mother explained that she had been doing "everything" she could to get Maxie back in her care, but it seemed like everything she did was not working. She did not know of any other relatives, besides those who she had already identified, with no CPS history who could care for Maxie. She believed that it was in Maxie's best interest to be returned to her.

**Analysis**

Viewing the entire record in the light most favorable to the trial court's best-interest finding, we hold that the Department proved by clear and convincing evidence

27e68be (last visited July 11, 2022); *see also* Tex. Fam. Code Ann. §§ 264.151–.172 (describing and providing requirements for Department oversight of private community-based-care system for the State of Texas).

that terminating the parent–child relationship was in Maxie's best interest. Mother used cocaine and marijuana while pregnant with Maxie and, by her own admission, continued using marijuana while pregnant with her second daughter, Minnie. She chose not to visit Maxie between July 2021 and January 2022, and the foster mother testified that "it doesn't seem like there's a lot of bonding there" when Mother did visit with Maxie. In contrast, Maxie was "very bonded with the foster home," according to the Department's permanency specialist.

Mother also failed to demonstrate a sustained ability to provide for a child's needs—let alone two children's needs—including maintaining a safe, clean living environment. When the electricity went out at her apartment in the dead of winter, she was willing to "sit there in the dark" rather than "ask for help," yet she asked Maxie's foster parents for money to bail her abusive boyfriend out of jail and to pay for a plane ticket so she could go on a family vacation. Additionally, she took on the responsibility of caring for her two younger brothers when she had not yet been able to maintain a stable home, much less provide for her two children. While Mother appears to have a supportive family structure, the Department could not find one suitable placement for Maxie within Mother's family. The trial court could reasonably have found that, even if Mother's father had the means to provide for Mother, Maxie, Minnie, the two brothers, and himself, it was not in Maxie's best interest to live with Mother and Grandfather because of his drug-abuse and domestic-violence history.

Further, while Mother failed to show she could provide for Maxie or comply

12

with the court-ordered safety plan, she had another child, fathered by a man (Bobby) who showed a pattern of impregnating and abusing women. Mother's on-again/off-again relationship with Bobby evinced not only an unstable home life but also the emotional and physical danger to Maxie should she be placed with Mother. A reasonable factfinder could not ignore the instability in Mother's relationships, employment, and housing situation. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) ("Stability and permanence are paramount in the upbringing of a child.").

In arguing that "OCOK[5] did not overcome the strong presumption that terminating the parent–child relationship" between Mother and Maxie was not in Maxie's best interest, Mother points out that the foster parents indicated they were not adoption-motivated. But at the hearing, the foster mother testified that they were "considering" adopting Maxie. And the trial court could have determined that the instability Maxie would face if returned to Mother outweighed any concern about her remaining in foster care. Stability of the child is paramount, which is why it is preferable to see evidence of an adoption-motivated home, but a trial court can decide that the potential of successive foster-care placements is preferable to returning the child to a demonstrably unstable environment.

---

[5]As we have noted, OCOK contracts with the Department; it is not a party to this appeal.

Mother correctly argues that a parent's right to the companionship, care, custody, and management of her children are constitutional interests "far more precious than any property right." *See Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). But "just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *E.C.R.*, 402 S.W.3d at 240 (quoting *C.H.*, 89 S.W.3d at 26).

We hold that under the applicable review standards, a factfinder could reasonably form a firm belief or conviction that terminating Mother's parental rights was in Maxie's best interest and that the evidence is therefore legally and factually sufficient to support the best-interest finding. *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Mother's lone issue on appeal and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: July 21, 2022

14